No. 25-10526

In The
# United States Court of Appeals for the Fifth Circuit

DESIRAE MONIQUE MATA,

*Petitioner-Appellant,*

v.

ERIC GUERRERO, DIRECTOR TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

*Respondent-Appellee.*

On Direct Appeal from the United States District
Court for the Northern District of Texas, Lubbock Division
No. 5:20-CV-86

# APPELLANT'S OPENING BRIEF ON THE MERITS

Allison Clayton
Texas State Bar No. 24059587
Innocence Project of Texas, Texas Tech School of Law Innocence Clinic
3311 18th Street
Lubbock, Texas 79409-0004
P: (806) 773-6889  |  F: (806) 688-4515
Allison@IPofTexas.com

***Attorney for Appellant***

No. 25-10526

# In The
# United States Court of Appeals for the Fifth Circuit

---

DESIRAE MONIQUE MATA,

*Petitioner-Appellant,*

v.

ERIC GUERRERO, DIRECTOR TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

*Respondent-Appellee.*

---

On Direct Appeal from the United States District
Court for the Northern District of Texas, Lubbock Division
No. 5:20-CV-86

---

# APPELLANT'S OPENING BRIEF ON THE MERITS

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal. *See* 5th Cir. R. 28.2.1.

| PARTIES | COUNSEL |
|---|---|
| **Petitioner-Appellant**<br>Desirae Monique Mata<br>TDCJ-CID # 01976162 | <u>**Trial Counsel**</u><br>David Martinez<br><br><u>**Appellate & Post-Conviction Counsel**</u><br>B. Allison Clayton |
| **Respondent-Appellee**<br>Eric Guerrero, Director TDCJ-CID | <u>**State Trial &Appellate Counsel**</u><br>Michael Munk<br>Jason Bujnosek<br><br><u>**State Post-Conviction Counsel**</u><br>Philip Furlow<br>Lindsay Williams<br><br><u>**Federal Post-Conviction Counsel**</u><br>Sarah Harp |

| COURTS | COUNSEL / JUDGE |
|---|---|
| **State Trial Judge**<br>106th Judicial District, Gaines County, TX | Honorable Carter T. Schildknecht<br>(judge presiding over trial)<br><br>Honorable Reed A. Filley<br>(judge presiding over habeas corpus proceedings) |
| **State Intermediate Court Panel**<br>Eleventh Court of Appeals of Texas | Honorable Jim R. Wright, C.J.<br>Honorable Michael "Mike" Wilson, J.<br>Honorable John M. Bailey, J. |
| **Texas Court of Criminal Appeals** | |
| **Federal District Judge**<br>Northern District of Texas<br>Lubbock Division | Honorable Judge J. Wesley Hendrix |

Respectfully submitted,

/s/ Allison Clayton
Allison Clayton
TX State Bar No. 24059587
*Counsel for Petitioner-Appellant Desirae Monique Mata*

## **STATEMENT REGARDING ORAL ARGUMENT**

Appellant respectfully requests oral argument due to the constitutional significance and procedural complexity of the issues presented. This appeal centers on whether the district court erred in concluding that the Texas Court of Criminal Appeals reasonably rejected claims under *Napue* and *Brady*, despite undisputed evidence that a key State's witness gave false testimony and that the State suppressed favorable impeachment evidence. The question is not whether the jury was merely misled, it is whether there is any reasonable likelihood that the truth would have changed the verdict. That materiality determination, viewed through the deferential lens of § 2254(d), requires precise analysis of how this false and undisclosed testimony impacted the trial. Oral argument will aid the Court in applying this legal standard to a record where the only evidence placing Appellant at the crime scene came from the very witness whose credibility was compromised. In light of the growing complexity of jurisprudence involving informant testimony and prosecutorial misconduct, oral argument is warranted.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................... ii

STATEMENT REGARDING ORAL ARGUMENT ........................... iii

TABLE OF AUTHORITIES ................................................. vi

JURISDICTIONAL STATEMENT ............................................ 1

STATEMENT OF ISSUES .................................................. 2

STATEMENT OF THE CASE ............................................... 3
   I.   BACKGROUND FACTS ............................................ 3
   II.  PROCEDURAL HISTORY ........................................ 10

SUMMARY OF THE ARGUMENT .......................................... 13

ARGUMENT AND AUTHORITIES .......................................... 15
   I.   Standard of Review ............................................ 15

   II.  The TCCA unreasonably applied federal law when it denied Mata's request for post-conviction habeas corpus relief, because her trial was tainted by material violations of *Brady* and *Napue* ............................. 17

      II.A.  ***Ground One***: The TCCA's Finding That the Informant's False Testimony Was Not Material Under *Napue* Was an Unreasonable Application of Clearly Established Federal Law ....................... 19
        II.A.1.  The *Napue* materiality standard ..................................... 19
        II.A.2.  The informant's testimony was the only evidence placing Appellant at the scene of the crime ................................ 23
        II.A.3.  The informant's testimony was material under *Napue's* standard ........................................................ 29

## TABLE OF CONTENTS CONT'D

II.B.   ***Ground Two***: The TCCA's Finding that the Suppressed Impeachment Evidence Was Not Material Under *Brady* Was an Unreasonable Application of Clearly Established Federal Law ...34

    II.B.1.   The *Brady* materiality standard .....................................35

    II.B.2.   Brown's testimony was material under *Brady's* standard ...............................................39

III.   **Conclusion** ........................................................................ 44

**PRAYER** ................................................................................46

**CERTIFICATE OF SERVICE** ...............................................48

**CERTIFICATE OF COMPLIANCE** .......................................48

# TABLE OF AUTHORITIES
## CASES

*Anaya v. Lumpkin*,
   976 F.3d 545 (5th Cir. 2020) ............................................................. 15

*Brady v. Maryland*,
   373 U.S. 83 (1963) .....................................................................passim

*Busby v. Dretke*,
   359 F.3d 713 (5th Cir. 2004) ...................................................... 16, 43

*Chapman v. California*,
   386 U.S. 18 (1967) ........................................................................ 21

*Cullen v. Pinholster*,
   563 U.S. 170 (2011) ...................................................................... 16

*Evans v. Davis*,
   875 F.3d 210 (5th Cir. 2017) ........................................................ 16

*Giglio v. United States*,
   405 U.S. 150 (1972)................................................ 19, 20, 29, 32, 34

*Glossip v. Oklahoma*,
   145 S.Ct. 612 (2025)................................................................passim

*Harrington v. Richter*,
   562 U.S. 86 (2011) .................................................................. 34, 43

*Holberg v. Guerrero*,
   130 F.4th 493 (5th Cir. 2025) ..................................................passim

# TABLE OF AUTHORITIES CONT'D

*Kyles v. Whitley*,
  514 U.S. 419 (1995) ................................................................passim

*LaCaze v. Warden La. Corr. Inst. for Women*,
  645 F.3d 728 (5th Cir. 2011)......................................................passim

*Napue v. Illinois*,
  360 U.S. 264 (1959) ................................................................passim

*Robertson v. Cain*,
  324 F.3d 297 (5th Cir. 2003) ............................................................ 15

*Tassin v. Cain*,
  517 F.3d 770 (5th Cir. 2008)...................................... 20, 32, 34, 36, 41

*Thompson v. Cain*,
  161 F.3d 802 (5th Cir. 1998) ......................................................16, 17

*United States v. Bagley*,
  473 U.S. 667 (1985) .................................................. 20, 21, 33, 34, 35

*United States v. Brown*,
  650 F.3d 581 (5th Cir. 2011) ............................................................ 17

*United States v. Guerrero*,
  768 F.3d 351 (5th Cir. 2014) ............................................................ 17

*United States v. Mason*,
  293 F.3d 826 (5th Cir. 2002) ............................................................ 20

# TABLE OF AUTHORITIES CONT'D

*United States v. O'Keefe*,
128 F.3d 885 (5th Cir. 1997) ............................................................ 17

*United States v. Sipe*,
388 F.3d 471 (5th Cir. 2004) ............................................................ 17

*United States v. Washington*,
44 F.3d 1271 (5th Cir. 1995) ............................................................32

*Uvukansi v. Guerrero*,
126 F.4th 382 (5th Cir. 2025) .................................................... 22, 34

*Wearry v. Cain*,
577 U.S. 385 (2016) .............................................................38, 41, 43

*Williams v. Taylor*,
529 U.S. 362 (2000) .................................................................. 16, 43

## STATUTES

28 U.S.C. § 2253(c)(1) ...................................................................1, 17

28 U.S.C. § 2254(d) ............................................................. 14, 15, 39

28 U.S.C. § 2254(d)(1) ...........................................................passim

28 U.S.C. § 2254(d)(2) ................................................................. 46

28 U.S.C. § 2254(e)(1) ................................................................ 16

28 U.S.C. § 2255(c)(1) ................................................................. 2

# TABLE OF AUTHORITIES cont'd

## Rules

Fed. R. App. P. 4(a)(1)(A) ........................................................................ 1

Fed. R. App. P. 22 .................................................................................... 1

Fed. R. App. P. 26(a)(1) .......................................................................... 1

Fed. R. App. P. 32.3 ............................................................................... 48

Fed. R. App. P. 32(a)(7)(B) .................................................................... 48

Fed. R. Crim. P. 35 ........................................................................... 24, 40

# JURISDICTIONAL STATEMENT

This is an appeal from a final decision of the U.S. District Court for the Northern District of Texas, Lubbock Division, which entered judgment denying Appellant Mata's petition for habeas corpus. ROA.2799. The district court's jurisdiction over the subject matter of Mata's petition arose from the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), under which a state court's denial of a habeas corpus claim arising out of a state conviction may be reviewed by the federal court if the petition is filed within the timeline prescribed by AEDPA. 28 U.S.C. § 2244(d). This Court has jurisdiction under 28 U.S.C Section 2253(c), as a result of the Certificate of Appealability granted by the District Court as to Grounds One and Four of the Mata's Section 2254 Petition. *See* Fed. R. App. P. 22(b); ROA.2834.

The district court entered final written judgment denying habeas relief on March 12, 2025. The thirty-day clock for filing a Notice of Appeal (NOA) began on March 13, 2025. Fed. R. App. P. 26(a)(1). The NOA was filed on April 11, 2025, within the thirty-day period. Fed. R. App. P. 4(a)(1)(A); ROA.2839-40. The instant appeal follows.

# STATEMENT OF ISSUES

The District Court for the Northern District of Texas, Lubbock Division, granted a Certificate of Appealability on two grounds (Grounds One and Four from Appellant's 2254 Petition). ROA.2834; *see* 28 U.S.C. § 2255(c)(1). Both of those grounds are based on the same facts: Angie Brown was a jailhouse informant and the State's star witness. She testified she was not expecting anything in return for her testimony. That was false. In reality, she had exchanged multiple letters with investigators and with the prosecutor on the case, saying she would testify only if her federal sentence got reduced. The prosecutor told the jury he knew nothing about any deal. That was also false. The damning letters were not discovered until years after Petitioner's trial, after a new district attorney took over the office. No one disputes that the witness and prosecutor intentionally acted in bad faith. Based on those facts, these are the issues presented:

### I.

Does the record establish a reasonable likelihood that the informant's false testimony affected the jury's verdict, such that the TCCA's denial of Petitioner's *Napue* claim was an unreasonable application of clearly established federal law?

### II.

Does the record establish a reasonable probability that disclosure of the informant's expectations for leniency would have changed the outcome of the trial, such that the TCCA's denial of Petitioner's *Brady* claim was an unreasonable application of clearly established federal law?

## STATEMENT OF THE CASE

### I.    Background Facts

In the spring of 2012, John Allen and Jay Doyal were murdered in an apparent robbery-gone-wrong. ROA.1040. After the murders, law enforcement quickly—and with little direct evidence—narrowed in on four suspects, including Desirae Monique Mata (Appellant). Allen, an active drug dealer and user, and Mata, also a drug user, ran in similar circles. ROA.1041. Mata had even lived with Allen for some time. She moved out on friendly terms after Allen decided to move out of state, which was about a month before his murder. ROA.1361. Mata knew the layout of Allen's home and that he had a security system.

Mata's DNA was potentially on the scene,[1] which was unremarkable since she had recently lived there. One of the other co-defendants stated that a Desirae *Reyna* (a real person) was involved; he explicitly rejected both to police and at Mata's trial that he really meant Desirae Mata. Other than that, the evidence linking Mata to the murder scene was sparse. No murder weapon was recovered, and no physical evidence placed Mata at the scene at the time of the killings.

---

[1] A meth pipe and lighter were found in Jay Doyal's hands. ROA.1098. After DNA testing was performed on the meth pipe, results showed Mata could not be "excluded as a contributor" of the DNA found on the pipe. ROA.1400. Despite these results, it is undisputed that Mata had previously lived at and used drugs in Allen's house. ROA.1361. Finding her DNA on the meth pipe was wholly unsurprising, a fact which was conceded by the State's expert at trial. ROA.1407.

Shortly after the murders, Mata traveled to visit family in Alabama for a wedding that had been planned the year before. ROA.1128. While in Alabama, a Texas warrant issued for her arrest on the murders. ROA.1369-70. Alabama authorities executed the warrant, and Mata was taken into custody in Alabama. ROA.1128.

Mata was incarcerated in an Alabama jail facility while awaiting extradition to Texas. ROA.1118. A few jail cells down from Mata was Angie Brown, a federal detainee in custody on unrelated charges. ROA.1192, 1413. Mata and Brown were in the same unit for only a few days before Mata was extradited back to Texas. ROA.1192. Brown remained in Alabama, but her involvement in Mata's case was just beginning.

Brown (sometimes unilaterally, sometimes through her attorney) repeatedly reached out to Texas law enforcement; prosecutor Michael Munk (who was prosecuting Mata); and AUSA William Simpson (who was prosecuting Brown's case), seeking a deal. ROA.1192. Eventually, Brown's attorney, Rita Briles, arranged a meeting between Brown and Texas investigators, who flew to Alabama to hear what she had to say. ROA.1192. Brown claimed that Mata—a stranger who was housed in the same facility as Brown for mere days—had confessed to the murders. ROA.1423-24, 2490. Briles typed Brown's statement in the presence of police. ROA.1193.

Of course, Brown was not offering this information out of the goodness of her heart or to serve the community. She was cooperating with law enforcement and the prosecution for one reason, and one reason only: she expected a sentence reduction in her case in return for her statements against Mata and Mata's co-defendants. This was not new behavior. Brown had developed a reputation in jail for offering information about other inmates in hopes of trading it for leniency. ROA.1544.

At the time, Mata knew about Brown's reputation as a career jailhouse informant, and she suspected Brown was getting a deal in exchange for her testimony. But Mata's suspicions were quelled when her attorney point blank asked prosecutor Michael Munk whether Brown was expecting anything in exchange for her testimony. Munk looked him in the eye and lied. Specifically, Munk assured Mata's attorney, "there was no deal or expectation of a deal with Brown that he knew about." ROA.2490. That statement was false, and Munk knew it when he said it.

At trial, Brown *and her attorney* cemented the false impression that Brown expected nothing in return for her testimony. Brown testified she was not expecting "*any kind of favorable deal*" in return for her testimony. ROA.1439 (emphasis added). But it was her attorney, Rita Briles—a licensed member of the bar and officer of the court—who gave that lie its most authoritative voice. Briles assured the jury that nothing had been "communicated to [Brown] that she would gain some advantage

or lose something if she didn't make the statement [to detectives about Mata]." ROA.1204. Briles also stated that, as of the trial date in January 2015, she was unaware of "any offers of leniency *or anything else*" tied to Brown's testimony. ROA.1204–05. Evidence in the form of signed letters from Briles to Munk dated years before Mata's trial would later prove Briles was also lying. But at the time, the jury had no reason to question the word of a criminal defense attorney who stood before them in open court, speaking with the weight and authority of legal ethics behind her. But that authority only served to reinforce a falsehood—one that Munk intentionally elicited and then failed to correct.

But Munk did not stop there. He did not just intentionally elicit false testimony—twice—and stand silent so that it went uncorrected—twice. In a final blow, Munk weaponized the falsehood. In his final closing argument, Munk looked the jurors in the eye and said, "I don't know anything about [a deal]." ROA.1884. He acknowledged that defense counsel was trying to undermine Brown's credibility by asking whether she was perhaps hoping for a deal for her testimony. "I don't know anything about that," he repeated. ROA.1884-85. "You heard her testify. 'Not that man sitting right there,' pointing to me. I didn't make her any deal." ROA.1884–85.

Simply put, the jury was lied to—again and again and again—about the motivations behind the testimony of the State's central witness. The State knew it

every step of the way. It did not correct Brown's perjury—it endorsed and weaponized it.

Brown's testimony was the only evidence that directly placed Mata at the scene of the murders. Not even Mata's alleged co-defendant, Juan Castillo, implicated her. In his initial (and later recanted) confession to police, Castillo named a woman named Desirae *Reyna*, not Desirae *Mata*, as the female participant. ROA.1482, 1488. He picked *Reyna* out of a photo lineup that included both women. Even later, at Mata's trial, Castillo took the stand and insisted he had never identified Mata.[2] ROA.1458-59.

Thanks to Angie Brown, Mata was convicted in 2015 and received two sentences of life in prison without the possibility of parole. ROA.1895, 1904. Mata has maintained her innocence from day one. Years later, during the 2018 trial of co-defendant Bobby Ruiz, the man who actually pulled the trigger gave a detailed account of the crime and confirmed that Mata was not there. His testimony aligned with what Mata had said all along: she had nothing to do with the murders. But by the time the truth came out, the damage was done.

It was not until Ruiz's trial that the truth about Angie Brown came out as well. ROA.2719. In the years between the two trials, Munk lost re-election and a new

---

[2] Desirae Reyna was ruled out because she was in jail at the time of the murders. ROA.1162.

district attorney took office. For the first time, one of the defendants (not Mata, but Ruiz) received in discovery *from the DA's office* letters *in the DA's files* that had never been disclosed during Mata's trial. These letters proved that Brown not only sought but was *desperate* for a sentence reduction in exchange for her testimony. They were offered into evidence in Ruiz's trial, which is how Mata was finally able to obtain them. They revealed, among other things, the following:

- On September 3, 2013, more than a year before Mata's trial, Brown's attorney Rita Briles wrote a letter to prosecutor Munk, detailing Brown's assistance with the Texas Rangers' investigation into Mata. She specifically requested that he "forward a letter to William Simpson, Assistant U.S. Attorney . . . and let him know that Ms. Brown's information was extremely helpful in the investigation of and pending prosecution of the double homicide. The Assistant U.S. attorney would *seriously consider* filing a motion to have Ms. Brown's present sentence reduced." ROA.2715 (emphasis added). Briles knew about Brown's expectation of a deal; her testimony otherwise was a lie.

- On October 28, 2013, Brown wrote a letter to prosecutor Munk, explaining that she "was expecting the assistance that [she] gave to help reduce [her] federal sentence." ROA.2711. Munk knew that Brown was expecting a deal.

- On October 28, 2013, Brown wrote a letter to Assistant U.S. Attorney William Simpson, asking him to make a Rule 35 motion for sentence reduction, based on her statement and letters to the Texas Rangers regarding Mata, which she enclosed. ROA.2718.

- On October 28, 2013, Brown also wrote a letter to Texas Ranger Brian Burney, asking for assistance in seeking a sentence reduction stating, ". . . I am in *desperate* need and I need this reduction. The reduction is not just for me, but *my children* mostly because *they need me*." ROA.2409 (emphasis added).

- On November 12, 2013, Simpson wrote a letter to Brown, advising her that she did not yet qualify for a Rule 35(b) sentence reduction, and "should [she] wish for [him] to consider [her] request . . . , [she would] need to provide [him] with written information [he could] assess and incorporate into a motion." ROA.2717.

- On November 15, 2013, Brown wrote another letter to Texas Ranger Brian Burney, asking him to "*[p]lease do what you agreed to do to help me.*" ROA.2712 (emphasis added).

- On November 23, 2016, after Brown's false testimony had sent Appellant Desirae Mata to prison, District Attorney Munk wrote a letter to AUSA Simpson, detailing Brown's assistance to the State. The relevant parts of the letter are as follows:

  - "I was not aware that you had needed more details about the case Ms. Angie Brown was involved in. Let me tell you as much as I can."

  - "I consider the value of Ms. Brown's testimony to be important."

  - "Although Ms. Brown's was not the only testimony to implicate the four codefendants, my opinion is that it corroborated many details of Juan Castillo's confession . . . . And *in a case with little or no physical evidence and no murder weapon, my opinion is that it **played a large role in the convictions** of both Ms. Mata* and Mr. Castillo." ROA.2270-71 (emphasis added).

On February 15, 2017, the deal that Brown was so desperate for and so insistent about was consummated. AUSA Simpson filed a sealed order in the Northern District of Alabama, Southern Division, requesting to reduce Brown's sentence by sixty months (180 months to 120 months). ROA.2267-69. The Government's motion made abundantly clear that Brown's sentence reduction was

entirely attributable to her "past and prospective assistance to the District Attorney's office in Gaines County, Texas." ROA.2268-69. On February 15, 2017, Brown received exactly what she had asked for when the Government's motion was granted. ROA.2272. This outcome flatly contradicted Munk's assurances to defense counsel, Brown's sworn statements to the jury, Briles's sworn statements to the jury, and Munk's own denials in closing argument that Brown's testimony was not procured on any promise of leniency.

## II.     Procedural History

Appellant Desirae Mata was convicted of two counts of murder in the 106th Judicial District Court of Gaines County, Texas. ROA.2514. On January 15, 2015, the trial court imposed a sentence of life without parole for each count. ROA.2519-20.

On July 13, 2017, the Eleventh Court of Appeals affirmed the jury's guilty verdict and the trial court's sentencing in an unpublished opinion. ROA.72-80, 81; *Mata v. State*, No. 11-15-00081-CR, 2017 WL 2986845 (Tex. App.—Eastland July 13, 2017, pet. ref'd). Mata then filed a Petition for Discretionary Review with the Texas Court of Criminal Appeals (TCCA) on September 20, 2017, which was subsequently denied on February 28, 2018. ROA.192, 202; *Mata v. State*, 542 S.W.3d 582 (Tex. Crim. App. 2018) (mem. op.).

She then filed an application for state habeas relief under Article 11.07 of the Texas Code of Criminal Procedure. ROA.2312. The trial court granted an unopposed motion to stay proceedings for ninety days so Mata could gather materials from co-defendant Ruiz's trial, i.e. the trial exhibits containing all the letters back-and-forth about the deal for Angie Brown. ROA.2412–20. But before the court could enter the stay, the district court clerk prematurely forwarded the incomplete record to the TCCA. ROA.2421. Recognizing the mistake, the TCCA remanded the case and ordered the trial court to conduct an evidentiary investigation and enter findings of fact and conclusions of law. ROA.2421, 2575.

*That never happened.* No hearing was held. No fact findings were made. No conclusions of law were entered. The only document the trial court entered was an order saying there were no fact issues to resolve (despite the TCCA's order otherwise). The district clerk again forwarded the record to the TCCA. After less than two months with the TCCA, on April 15, 2020, the court issued a postcard denial ***based on the trial court's findings of fact and conclusions of law.***[3]

The problem? ***There were no findings of fact and conclusions of law.*** The TCCA relied on a document that did not exist. It denied relief by pretending the trial

---

[3] This was a remarkably swift turnaround, particularly given the voluminous nature of the record. While court dockets and timelines naturally vary, it is difficult to overlook the contrast: the TCCA disposed of this case in under two months, whereas the federal district court—faced with the same record— took over two years.

court had done something it had not done. That procedural sleight of hand deprived Mata of meaningful review and allowed the State's shocking misconduct to go unchecked.

Five days later, on April 20, 2020, Mata filed her first federal habeas corpus application under 28 U.S.C. § 2254. ROA.7-23. The federal district court granted stay on the application's proceedings in order for Mata to litigate her Suggestion for Reconsideration with the TCCA. ROA.40. Mata returned to the TCCA to petition for reconsideration on her state habeas claim and subsequently filed a second petition for state habeas relief. ROA.2427-31. The TCCA denied reconsideration and dismissed the second petition. ROA.2577-78.

Mata's second federal petition was filed on September 20, 2021. ROA.43-58. The federal district court ultimately lifted the stay on the original proceedings and consolidated both cases. ROA.41-42. On March 12, 2025, the district court denied relief with prejudice on Grounds 2 and 3. ROA.2800-2837. It granted a Certificate of Appealability, however, on Mata's Grounds 1 and 4:

> Ground 1 in the Petition (and the basis for Ground 1 in this appeal):
> Mata was convicted based on the testimony of a jailhouse informant who falsely testified that she was not expecting anything in exchange for her testimony, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959); and

> Ground 4 in the Petition (and the basis for Ground 2 in this appeal):
> The state court denied Mata's prosecutorial misconduct claims contrary to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Kyles v. Whitley*, 541 U.S. 419

(1995), even though the prosecutor lied to defense counsel and the jury about the jailhouse informant's expectations of favorable treatment in exchange for her testimony against Mata.

ROA.2835.

## SUMMARY OF THE ARGUMENT

Desirae Mata was convicted of capital murder based on the testimony a jailhouse informant named Angie Brown. Brown told the jury she expected nothing in return for her testimony. Her attorney reinforced that claim. So did the prosecutor. All of them knew it was false. And none of them corrected it.

After trial, Brown received a five-year reduction of her federal sentence for her "past and prospective assistance to the District Attorney's office in Gaines County, Texas." That reduction was granted under Rule 35(b), which only applies when a witness provides substantial assistance in prosecuting another person—in this case, Desirae Mata. That sentence reduction was obtained at the direct request of the same prosecutor who tried Mata, and it was based on letters that Brown sent asking for help—letters the jury never saw, because the State never disclosed them.

**This is a textbook *Napue* violation (ground 1).** Brown testified falsely. The prosecutor knew it. And instead of correcting the lie, he elicited it, reinforced it, and then personally relied on it in closing. His actions are not just ethically indefensible; they are constitutionally fatal. Under *Napue v. Illinois*, 360 U.S. 264 (1959), a

conviction obtained through false testimony—when the prosecution knew it was false—cannot stand if there is any reasonable likelihood that the falsehood affected the jury's verdict. That standard is easily met here. Brown was the only person who placed Mata at the crime scene. Without her testimony, the State had no direct evidence of Mata's guilt.

**The failure to disclose the deal also violated *Brady* (ground 2).** The letters Brown wrote asking for leniency, especially when viewed in tandem with the post-trial sentence reduction, were plainly favorable impeachment material. The State had them. The defense did not. That is a *Brady* violation. And while the State now insists the letters would not have changed anything, that is not the test. *Brady v. Maryland*, 373 U.S. 83 (1963), requires disclosure of favorable evidence where there is a reasonable probability that, had it been disclosed, the result would have been different. In a case hinging on Brown's credibility, there is no doubt that the suppressed evidence undermines confidence in the outcome.

The state court's contrary decision was not just wrong—it was unreasonable under 28 U.S.C. § 2254(d). Because the record shows that the State elicited, relied on, and concealed critical evidence related to its only witness, this Court must grant relief.

# ARGUMENT AND AUTHORITIES

## I.    Standard of Review

"When a district court denies a § 2254 application, [the Circuit Court] review[s] the district court's findings of fact for clear error and its conclusions of law de novo, 'applying the same standard of review to the state court's decision as the district court.'" *Anaya v. Lumpkin*, 976 F.3d 545, 550 (5th Cir. 2020) (quoting *Robertson v. Cain*, 324 F.3d 297, 301 (5th Cir. 2003)). When questions are a mixture of law and fact, they are reviewed de novo. *Id.*

Federal habeas petitions filed after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) are governed by 28 U.S.C. Section 2254(d). Under AEDPA, relief may not be granted unless the state court's adjudication of the claim:

> **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The inquiry is limited to the record before the state court that adjudicated the claim on the merits, but the review remains focused on whether that adjudication meets constitutional standards.

Factual determinations made by the state court are presumed correct and may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). As a result, federal courts owe substantial deference to state court findings unless the petitioner can overcome that presumption with compelling proof. *Thompson v. Cain*, 161 F.3d 802, 805 (5th Cir. 1998).

A state court decision is considered "contrary to" clearly established federal law if it applies a legal rule that directly conflicts with Supreme Court precedent or if it confronts materially indistinguishable facts and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir. 2004). An "unreasonable application" occurs when the state court identifies the correct governing legal principle but applies it in an objectively unreasonable manner to the facts of the case. *Williams*, 529 U.S. at 409, 413.

Importantly, federal habeas review is confined to the record before the state court at the time it adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011). A petitioner must therefore show that—based solely on the state court record—any possible theory the state court could have relied on was either contrary to or an unreasonable application of clearly established federal law. *Evans v. Davis*, 875 F.3d 210, 217 (5th Cir. 2017).

Review on appeal is further limited to the issues specified in the Certificate of Appealability. 28 U.S.C. § 2253(c)(1). In this case, the district court granted a Certificate of Appealability on Grounds One and Four of the Petition, which involve claims under *Napue* and *Brady*, respectively, challenging the materiality of suppressed and false evidence. ROA.2835. Because materiality presents a mixed question of law and fact, it is reviewed de novo. *Thompson v. Cain*, 161 F.3d 802, 805 (5th Cir. 1998) (citing *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997)). Deference is given to the district court's factual findings. *United States v. Brown*, 650 F.3d 581, 618–19 (5th Cir. 2011); *United States v. Sipe*, 388 F.3d 471, 479 (5th Cir. 2004); *United States v. Guerrero*, 768 F.3d 351, 363 (5th Cir. 2014). The bottom line is that this Court's standard of review is to answer the question, de novo, of whether the TCCA's denial of Mata's state habeas petition involved an unreasonable application of clearly established federal law, i.e. *Napue* and its progeny and *Brady* and its progeny.

## II.    The TCCA unreasonably applied federal law when it denied Mata's request for post-conviction habeas corpus relief, because her trial was tainted by material violations of *Brady* and *Napue*

The Texas Court of Criminal Appeals (TCCA) denied Mata's application for post-conviction habeas corpus relief on April 15, 2020, after having it for less than two months. ROA.2603. The denial was issued "without written order" and

purportedly based "on the findings of the trial court without a hearing and on the Court's independent review of the record." ROA.2603. But the trial court never entered any findings.

There has never been any dispute that the State failed to disclose the impeachment letters in question. (*Mata v. Director*, *TDCJ-CID*, No. 5:20-CV-00086-H, "Opinion and Order," doc. 27, pg. 20 (Mar. 12, 2025) ["Dist. Ct. Op."]). Nor has there been any dispute that those letters were favorable to the defense. The letters showed that the State's central witness—a jailhouse informant—sought and received a benefit in exchange for her testimony. Yet the prosecutor told defense counsel and the jury otherwise, and the informant and her lawyer backed him up.

Because the TCCA issued a summary denial without explanation, the federal district court was left to guess at what the state court may have concluded. The court below assumed the TCCA impliedly found that the suppressed evidence was immaterial. But on this record, that assumption cannot survive scrutiny. With the facts of suppression and favorability not in dispute, materiality is the only question left. And under clearly established federal law, no fair application of the materiality standard can justify denying relief.

The governing law—*Napue*, *Brady*, and their progeny—is well-settled. And unlike the state court, which disposed of this case in under two months, the federal

court took more than two years to reach its conclusion. That alone reflects the complexity of the record and the significance of the issues at stake. This Court must now do what the state court would not: engage with the record and apply the law faithfully. Once it does so, it will see that the TCCA's denial of Mata's state habeas petition involved an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

## II.A.  Ground One: The TCCA's Finding That the Informant's False Testimony Was Not Material Under *Napue* Was an Unreasonable Application of Clearly Established Federal Law

As the court below recognized, and as the facts detailed in Statement of Case above establish, the State knowingly permitted Angie Brown's false testimony. (Dist. Ct. Op. at 27). The first two prongs of *Napue* are unquestionably established. The only real question is whether that lie was material. It was.

### II.A.1. The *Napue* materiality standard

The law in this area has been "clearly established" for almost seven decades.

*Giglio* and *Napue* set a clear precedent, establishing that where a key witness has received consideration or potential favors in exchange for testimony and lies about those favors, the trial is not fair. Although *Giglio* and *Napue* use the term "promise" in referring to covered-up deals, they establish that the crux of a Fourteenth Amendment violation is deception. A promise is unnecessary. Where, as here, the witness's credibility "was . . . an important issue in the case . . . evidence of *any understanding or agreement as to a future prosecution* would be relevant to his credibility and the jury was entitled to know of it."

*Tassin v. Cain*, 517 F.3d 770, 778 (5th Cir. 2008) (quoting *Giglio v. United States*, 405 U.S. 150, 153–54 (1972)) (emphasis in original); *Napue v. Illinois*, 360 U.S. 264 (1959); *see* 28 U.S.C. § 2254(d)(1).

There are three prongs to establishing a violation of due process under *Napue*: (1) the testimony was false; (2) the State knew the testimony was false; and (3) the false testimony was material. *United States v. Mason*, 293 F.3d 826, 828 (5th Cir. 2002) (citing *Giglio*, 405 U.S. at 153–54). Materiality under *Napue* "is not a sufficiency of evidence test." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995) (citing *United States v. Bagley*, 473 U.S. 667, 678 (1985)). It is a due process standard focused on fairness. A false statement is material if there is "*any reasonable likelihood* that the false testimony *could have* affected the judgment of the jury." *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271 (1959)) (emphasis added).

In effect, this materiality standard requires "the beneficiary of [the] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Glossip v. Oklahoma,* 145 S.Ct. 612, 627 (2025) (quoting *Bagley*, 473 U.S. at 680, n.9) (internal quotations omitted). Meaning that once a defendant establishes a *Napue* violation in which the prosecution knowingly solicited or allowed false testimony to go uncorrected, the burden essentially shifts to the State to prove its violation was harmless beyond a reasonable

doubt. *Id*.; *Chapman v. California*, 386 U.S. 18, 24 (1967). While "this rule is stated in terms. . . [of] harmless-error review, it may as easily be stated as a materiality standard under which the fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt." *Bagley*, 473 U.S. at 679–80.

The Supreme Court recently reaffirmed this low standard in *Glossip*. There, the State's key witness falsely testified that he had never received psychiatric treatment, when in fact he had been diagnosed with bipolar disorder and prescribed lithium. *Glossip*, 145 S.Ct. at 617. The State possessed records that contradicted this testimony but did not correct the record and withheld those records from the defense. *Id*. at 618.

The Court held that the falsehood was material because the witness's credibility was "necessarily determinative," and the jury "could convict Glossip only if it believed" the witness. *Id*. at 628. Importantly, the Court rejected arguments that the testimony was immaterial because other impeachment evidence had been introduced or because the truth later came out. *Id*. The inquiry under *Napue*, the Court emphasized, is whether there is *any* reasonable likelihood that the falsehood could have even just influenced the jury's judgment, not whether the remaining evidence was sufficient to convict. *Id*.

That principle is echoed by the Fifth Circuit in *Uvukansi*, which recognized that although "[n]o Supreme Court precedent clearly bars" considering whether the false testimony's "force was diminished by later testimony impeaching" it, the mere existence of some impeachment evidence does not end the inquiry. *Uvukansi v. Guerrero*, 126 F.4th 382, 391 (5th Cir. 2025), *petition for cert. filed*, No. 24-1089 (U.S. May 15, 2025).[4] In *Uvukansi*, the jury was well aware that the informant's sentencing was being postponed to allow consideration of his cooperation with Uvukansi's trial. *Id.* The Court compared this situation to *Napue*, where the jury was actively misled into thinking no deal existed at all. *See id.* (discussing *Napue*, 360 U.S. at 265–70).

By drawing this distinction, the Fifth Circuit made clear that materiality depends not just on whether some impeachment occurred, but whether the jury was fully informed in a way that would have cast the false testimony in a different light. *Id.* ("Knowing that the prosecutor had cut a deal with the witness would have put the testimony in a substantially different light."). Thus, as both *Glossip* and *Uvukansi* reaffirm, *Napue*'s materiality standard is deliberately low and exists to protect the

---

[4] On May 15, 2025, the petitioner in *Uvukansi*, filed a petition for writ of certiorari in the United States Supreme Court, raising questions about whether the proper burden of proof for materiality under *Napue* is "clearly established precedent." The Supreme Court has called for a response. Although the case is factually and procedurally distinct from this one—including a different theory of materiality and an eyewitness identification—the progress of the petition is noted here for the Court's awareness.

fairness of the trial—not to ask whether the prosecution still might have won without the lie.

### II.A.2. The informant's testimony was the only evidence placing Appellant at the scene of the crime

Brown's testimony was *central* to the State's case against Desirae Mata. On direct appeal, the intermediate appellate court discussed Brown's testimony at length, highlighting its importance in affirming Mata's conviction.[5] *Mata v. State*, No. 11-15-00081-CR, 2017 WL 2986845, at *1–2 (Tex. App.—Eastland July 13, 2017, pet. ref'd); ROA.72–80. And the significance of Brown's testimony was not just an appellate court observation—it came straight from the prosecutor himself.

In his letter endorsing the sentence reduction for Brown, the prosecutor represented to the federal court that Brown's testimony "played a large role" in Mata's conviction. Notably, that statement came from Michael Munk—the very same prosecutor who looked both defense counsel and the jurors in their eyes and lied to them about Brown's motives. ROA.2270-71. Yet even he did not describe

---

[5] The court below discussed the intermediate appellate court's opinion. Dist. Ct. Op. at 23. It cites the appellate court's discussion of other items of evidence that indicated Mata's guilt. *Id.* That is because, given the claim that Appellant made on direct appeal, such an analysis was informative and dispositive. But Appellant did not make the same claims on direct appeal that she has in state and federal writ. The appellate court's analysis would be helpful, for example, on a legal sufficiency claim. But that is not what Appellant is before the Court on. Simply put, the court of appeals was answering a question different from the question before this Court. So any reference to the appellate court's opinion, one way or the other, must be tempered with the baseline understanding that it was analyzing a fundamentally different claim.

Brown as a marginal or a cumulative or an *immaterial* witness. His words, without qualification, were that she "played a ***large*** role" in Mata's conviction. ROA.2270-71 (emphasis added).

Moreover, and of massive import, the federal government itself has affirmed the significance of Brown's testimony. As discussed above, the AUSA in Brown's federal case filed a Rule 35 motion seeking the reduction of Brown's sentence based on her "past and prospective assistance to the District Attorney's office in Gaines County, Texas." ROA.2268–69. The federal district court for the Northern District Alabama, Southern Division, granted that motion. ROA.2272.

Under Rule 35 of the Federal Rules of Criminal Procedure, a sentence reduction is reserved *only* for someone who has "provided *substantial* assistance in investigating or prosecuting another person." This is not a routine or casual act; it is a significant legal mechanism that permits the reduction of a sentence that has already been imposed by a judge following a conviction or guilty plea. This is an extraordinary act that is not taken lightly. Rule 35 motions are viewed by courts as solemn representations from the Government that the defendant's cooperation was not just helpful but materially advanced the interests of justice. In this case, the Government's filing of a Rule 35 motion for Brown demonstrates not only that she

received a benefit but that a State of Texas prosecutor *and* an Assistant United States Attorney *and* a federal district court all considered her testimony instrumental.

The State of Texas cannot have it both ways. Brown's cooperation was either "substantial assistance" warranting a five-year reduction of her mandatory minimum armed career criminal sentence in federal court, or it was immaterial to Mata's conviction. It cannot be both. There is no principle in law—or logic—that permits a federal court in Alabama to reduce a sentence based on the centrality of Brown's testimony, while courts in Texas cast aside that same testimony as inconsequential.

Research indicates that such a disingenuous maneuver would be the first of its kind in the nation. There appears to be no case—state or federal—blessing this kind of constitutional shell game, where the State withholds evidence, misleads the jury, obtains a Rule 35 sentence reduction, and then claims it does not matter. This is not just legally unsupported, it is legally unprecedented. And yet, the State slipped it through on the TCCA's "watch." It is trying to do the same thing before this Court. But this Court should not—and cannot—be the first to endorse such a fundamental distortion of "materiality" juxtaposed against the plain language of Federal Rule of Criminal Procedure 35. When the federal government, backed by a state prosecutor, seeks and secures a Rule 35 reduction, it is making a representation to the judiciary

that the assistance provided was critical. That representation is binding. A contrary conclusion here not only defies common sense; it undermines the integrity of judicial proceedings.

Despite this, the federal district court concluded that Brown's testimony could have been viewed as immaterial because it was corroborated by statements from Mata's co-defendant, Juan Castillo. ROA.2825. But that is factually inaccurate. Castillo confessed that he, two men, and *a* Desirae, specifically Desirae *Reyna*, had murdered the victims. ROA.1458-59, 1518. Police discovered Desirae Reyna was in jail the night of the murders; it could not have been her. ROA.1162. They also knew Desirae Mata was friends with one of the victims. So, police showed Castillo a lineup with both Desirae Mata and Desirae Reyna's pictures. ROA.1458-59. *Still*, Castillo picked Desirae *Reyna's* picture out of the lineup. ROA.1458-59.

The State has argued that by telling a friend that "Rollie's Desirae" was the Desirae involved in the robbery-gone-wrong,[6] Castillo affirmatively identified

---

[6] From day one, the argument has been that by telling a friend that "Rollie's Desirae" was the Desirae involved in the robbery-gone-wrong, Castillo must have meant Desirae Mata. (Dist. Ct. Op. at 4). But that infuriating assumption crumbles under scrutiny. Castillo explicitly *and only* identified Desirae *Reyna*—not Desirae Mata—in his statement to detectives and in photo lineup. ROA.1458–59, 1518. He also testified under oath that he did not know Mata. ROA.1188–89. The court below, in footnote 2, brushed this aside by reasoning that since Reyna was incarcerated at the time, Castillo simply must have meant Mata. (Dist. Ct. Op. at 4 n. 2). That is not legal analysis. It is retrofitting facts that do not fit to preserve a conviction.

Desirae Mata as having been involved. ROA.1882. This was also incorrect. *Castillo himself identified "Rollie's Desirae" as Desirae Reyna*. ROA.1458-59, 1518. At Mata's trial, Castillo took the stand and disavowed any involvement with Mata. ROA.1482, 1488. He said on multiple occasions, under oath, "I don't know Desirae Mata," and "I don't know who [Mata] is." ROA.1482, 1488.

Castillo later recanted his confession, so the evidence of Castillo's confession at Mata's trial came actually in through the hearsay of the police officer who elicited the confession and a friend who heard it. Neither one of these people who testified to Castillo's "confession" ever uttered the words "Desirae Mata" in front of the jury. ROA.1188-89 (Sheriff Jon Key's testimony regarding Juan Castillo's confession during which a hearsay objection was sustained and the witness was prohibited from testifying to Desirae Mata being implicated at all); ROA.1226-1228 (Castillo's friend's testimony during which a hearsay objection was sustained, and the prosecutor was told to instruct his witness not to mention Mata's name).

---

Instead of questioning whether Castillo's confession might be false (after all, Castillo got several other major facts wrong, too, and he insisted that his confession was false), the court below leapfrogged over the record and simply substituted in a different Desirae—one the witness explicitly disclaimed knowing. That leap is especially indefensible given the record evidence: Mata had a child with "Rollie," ROA.1111, but Rollie himself testified that he also had a relationship with Desirae Reyna. ROA.1665. So when Castillo referred to "Rollie's Desirae," he had legitimate grounds for meaning Reyna, as Rollie himself backed that up. There is no universe where a first name and a coincidence justify pinning two capital murder convictions on the wrong woman.

Consequently, literally the only person who put Desirae *Mata* at the scene was Angie Brown.

The district court also found Brown's false testimony to be immaterial because it was "supported by physical evidence at the scene, including [Mata's] DNA on the meth pipe intentionally positioned in one of the victim's hands . . . ." ROA.2825. This assertion misconstrues the results of the DNA testing, which concluded that "suspect Mata cannot be excluded as a contributor to this DNA at" 14 loci. ROA.1400. "Cannot be excluded as a contributor" is *not* the same as Mata's DNA being conclusively found on the meth pipe. ROA.1400. Further, even if it was, the State's own DNA expert explained that Mata had lived in the house not long before the murder, so finding her DNA was not surprising. ROA.1112, 1407.

The court below also references jail calls from Mata to Rollie and discussion of stolen diamonds that Rollie had given to Allen to sell. But none of that puts Mata at the scene of the murders. At most, those calls reflect background noise—vague associations and speculation about stolen property that offer no proof Mata was involved in the crime, let alone present when it occurred. Guilt by association is not evidence, and proximity to people or rumors is no substitute for proof beyond a reasonable doubt.

In reviewing the opinion of the court below, the Respondent's prior pleadings, and the Respondent's future pleadings look at what is *never* there. No one ever confronts head-on the core, undisputed fact: Angie Brown was the only person who ever placed Desirae Mata at the scene of the murders. Not a single other witness or piece of physical evidence puts her there. Without Brown, the State's case collapses. And yet, both the State and the court below treat Brown's testimony as just another brick in the wall, rather than the load-bearing beam it was. That distortion of the record goes to the heart of materiality.

### II.A.3. The informant's testimony was material under *Napue's* standard

Materiality under Napue asks whether there is *any reasonable likelihood* that the false testimony *could have affected* the judgment of the jury. *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271). As discussed in Section II.A.1., this is not a sufficiency-of-the-evidence test. *Kyles*, 514 U.S. at 434.

Brown was the only person who put Desirae Mata at the scene of the crime. That is not defense conjecture—it is the record. As detailed above, Castillo, the co-defendant, confessed to committing the crime with a Desirae but explicitly identified *that* Desirae as Desirae *Reyna*. He did not know Desirae Mata. ROA.1458–59, 1482, 1488. At Mata's trial, the jury never heard Mata's name connected to Castillo's confession. Not a single witness apart from Brown placed Mata at the crime scene.

The physical evidence was also incredibly weak. DNA did not support Brown's testimony. ROA.2825. The DNA expert testified that Mata could not be *excluded* as a contributor to DNA found on a meth pipe—and also noted Mata had recently lived in the house. ROA.1112, 1400, 1407. That is not proof of presence at the time of the murder; it is the residue of having once lived there. Similarly, the jail calls between Mata and Rollie do not put Mata on the scene at the time of the murder. Again, the only evidence that does that is Angie's Brown's testimony.

This analysis is not offered because *Napue* requires a sufficiency review. It does not. This analysis is performed because the court below and Respondent continue to conflate *materiality* with *sufficiency*. That is legal error. And to be clear, the defense is raising the point now to both address what the court below said while attempting to ensure that this Court does not make the same mistake. The importance of that distinction comes into sharp relief when considering the credibility of the only witness who placed Mata at the scene. Brown was a highly incentivized, desperate liar. She testified that she did not expect a deal. That was false. She wrote multiple letters asking for help. She got that help from the very prosecutor in Mata's case. She later admitted, in another trial, that her motive for testifying was to get a sentence reduction. ROA.2468. The jury in Mata's case never

heard that truth. They believed a witness who told them she was just doing the right thing.

There was a very small amount of impeachment evidence offered against Brown at trial, specifically Brown's singular letter to a police officer and testimony from another inmate at the jail. But that does not defeat materiality. There is a big difference between one letter to one police officer saying "do what you agreed to do to help me" and multiple letters across several months sent to several players including the prosecuting attorney saying Brown was "in desperate need [of] this reduction. The reduction is not just for me, but my children . . . " ROA.2407, ROA.2409. Moreover, there is an undeniable credibility imbalance between the testimony of an inmate facing criminal charges saying Brown was a known false snitch and a distinguished attorney (Rita Briles) saying that snitch is my client and I'm telling you she is not getting any deals in this case.

To equate the limited impeachment evidence presented at trial with the weight of the suppressed material is not just misguided, it is a fundamental misreading of the record. In point of fact, the State's selective disclosure made matters worse: by turning over one letter while withholding the rest, the prosecutor created the illusion of transparency, falsely signaling to the defense and the jury that there was nothing more to find. In fact, the State had multiple credibility bombshells

in its possession and chose to bury them. If the hidden impeachment evidence was not really all that bad, as the court below found, then why did the State hide it to begin with?

*Napue* and its progeny do not require the falsehood to be the *only* issue with credibility. They ask whether there was any reasonable likelihood that knowing the truth might have affected the jury's judgment.[7] *See Glossip*, 145 S.Ct. at 628; *Napue*, 360 U.S. at 270. Put differently, was the witness's credibility simply "an important issue in the case"? *See Giglio*, 405 U.S. at 153-54; *Tassin*, 517 F.3d at 778.

The Supreme Court in *Glossip* recently reaffirmed that even when other impeachment exists or the truth eventually emerges, the *falsehood itself* still matters. *Id.* In *Glossip*, the Court found materiality where the witness's credibility was "necessarily determinative." *Id.* at 628. The same is true here. Mata's conviction turned on whether the jury believed Brown. Because Brown's testimony was the only direct evidence of Mata's guilt, the jury's assessment of Brown's credibility was necessarily determinative here. *See id.*

---

[7] In previous litigation, the State has contended the "materiality prong [is] not met where allegedly perjurious statements 'have nothing to do with the defendant's guilt or innocence.'" ROA.2645 (quoting *United States v. Washington*, 44 F.3d 1271, 1282 (5th Cir. 1995)). This is not correct. When a jailhouse informant lies about hoping for a deal, "[i]t is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon [the] defendant's guilt. A lie is a lie, no matter what its subject . . . ." *Napue*, 360 U.S. at 269–70.

This is *exactly* what the Supreme Court meant in *Napue* and *Glossip* when it said due process is violated where false testimony *might* have affected the verdict. Because had the jury known the truth about Brown's desperation to get a sentence reduction, it might not have believed her. *See Napue*, 360 U.S. at 270. If the jury knew five years of freedom for Brown hung on her testimony and that she was desperate to get back to her young children, it would have treated the testimony differently. As in *Napue*, Mata's conviction is infirm because "the false testimony used by the State in securing the conviction of [Mata] may have had an effect on the outcome of the trial." *Id.* at 272.

Looked at from the other side, the State benefited from the error it created when it failed to disclose the deal with Brown. Accordingly, it is the State who must now prove *beyond a reasonable doubt* that the error *did not contribute* to the verdict. *See Bagley*, 473 U.S at 679-80; *Glossip*, 145 S.Ct. at 627. That is a burden the State has never carried here. In fact, it is impossible to see how the State could possibly carry that burden given the fact that the prosecutor himself acknowledged to an AUSA that because there was "little or no physical evidence and no murder weapon," Brown's testimony "played a large role" in Mata's conviction. ROA.2270-71. How can anyone contend beyond a reasonable doubt that the error did not contribute to the verdict when a federal court formally determined it was "significant" enough to

shave *five years* off the federal sentence of an armed career criminal? The State cannot simultaneously claim Brown's testimony was crucial enough to reduce her federal sentence while insisting that same testimony was immaterial to Mata's conviction. That contradiction cannot be reconciled

Because Brown was the only witness who placed Mata at the scene of the crime, her credibility was central to the State's case. The suppressed impeachment evidence went directly to that credibility, which is likely why the State suppressed it in the first place. Brown's testimony was absolutely material because there is a "reasonable likelihood" that had Brown's desperation for a deal been disclosed at least one juror would have ruled differently. Therefore, the district court decision is "contrary to clearly established federal law." *See Glossip*, 145 S.Ct. at 628; *Kyles*, 514 U.S. at 434; *Bagley*, 473 U.S. at 679-80*; Giglio*, 405 U.S. at 153-54; *Napue*, 360 U.S. at 264; *Uvukansi*, 126 F.4th at 391; *Tassin*, 517 F.3d at 778. Accordingly, relief is warranted. *See* 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

### III.B. Ground Two: The TCCA's Finding That the Suppressed Impeachment Evidence Was Not Material Under *Brady* Was an Unreasonable Application of Clearly Established Federal Law

The state court's proceeding resulted in a "decision that was contrary to, or . . . an unreasonable application of, clearly established Federal law" because the

State's failure to disclose the requested impeachment evidence against Brown constituted a violation of due process under *Brady v. Maryland*, 373 U.S. 83 (1963). *See* 28 U.S.C. § 2254(d)(1); *LaCaze v. Warden La. Corr. Inst. for Women*, 645 F.3d 728, 735 (5th Cir. 2011). Due process is violated, and *Brady* relief is warranted, when the State (1) suppresses evidence, (2) that is favorable to the defense, and (3) that evidence is material to the defendant's conviction. *See Brady*, 373 U.S. at 87. "Assuming a prisoner overcomes AEDPA's relitigation bar, successful *Brady* violations provide grounds for habeas relief." *Holberg v. Guerrero*, 130 F.4th 493, 499 (5th Cir. 2025). Again, because the district court acknowledged the State failed to disclose the letters Brown wrote seeking leniency, which were favorable to the defense and responsive to a direct discovery request, thus meeting the first two prongs of *Brady*, the only question for resolution is whether the suppressed evidence was material. ROA.2824.

### II.B.1. The *Brady* materiality standard

Under *Brady*, the materiality of suppressed evidence turns on whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. This rule applies to both exculpatory and impeachment material. *Id.* at 676 ("Impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady*

rule.") (internal quotation marks omitted). The standard does not demand a showing by a preponderance, nor does it require certainty of acquittal. *LaCaze*, 645 F.3d at 736 (citing *Kyles*, 514 U.S. at 434). It asks only whether there is a reasonable probability of a different result "such that the government's evidentiary suppression undermines confidence in the outcome of the trial." *Holberg v. Guerrero*, 130 F.4th 493, 500–01 (5th Cir. 2025) (internal quotation marks omitted).

Critically, courts do not engage in a sufficiency-of-the-evidence analysis in determining materiality. *Kyles*, 514 U.S. at 434. Materiality considers the suppressed evidence in the context of the whole record to determine its potential effect on the verdict. See *id.* at 436–37. As this Court recognized in *Tassin*, in a *Brady* challenge, the question is not whether the State's case can stand without the tainted testimony, it is whether the withheld evidence might have tilted the balance had the jury known it.

> The State argues that Georgina's testimony that the Tassins planned to commit a felony—armed robbery—was not the only testimony supporting Robert Tassin's death penalty conviction . . . The fact that other evidence could have supported two aggravating factors underlying Robert's capital conviction fails to address the question of the gravity of the false testimony at issue and how the State's failure to reveal the existence of a sentencing deal underlying that false testimony affected the jury's conclusions.

*Tassin v. Cain*, 517 F.3d 770, 780 (5th Cir. 2008). This Court upheld reversal of Tassin's conviction because,

> Regardless of the strength of the evidence presented by Stagner and the examiner, the central issue in the *Brady* analysis is how the evidence of Georgina's favorable sentencing deal would have affected the case as a whole . . . The jury was not informed of a beneficial sentencing agreement that hinged directly on Georgina's testimony, and Georgina was central to the State's case. The State not only failed to correct Georgina's misleading testimony with respect to that deal but capitalized on that testimony, arguing to the jury that Georgina had no reason to lie.

*Id.* at 781.

This rule applies not just to direct evidence of guilt but also to impeachment evidence. The suppression of favorable evidence remains material even where some impeachment material is already before the jury. *Holberg v. Guerrero*, 130 F.4th 493, 501 (5th Cir. 2025). In *Holberg*, the prosecution presented a jailhouse informant as an altruistic truth-teller, while withholding that she was a paid confidential informant who had received favors from police, including the dismissal of pending charges. *Id.* at 496–97. Even though there was other impeachment evidence in the record, this Court held the undisclosed informant status was material and that the state court's contrary finding was an unreasonable application of clearly established law. *Id.* at 502. In doing so, the Court observed that even if there is other impeachment evidence, the suppression of favorable evidence remains material where it would have "put the false testimony in a different light." *Holberg*, 130 F.4th at 502. The informant's credibility was central to the prosecution's case, and the withheld

evidence would have put that informant's credibility in a different light; accordingly, the suppressed evidence was material. *Id.* at 503–04.

The same result followed in *LaCaze*, where the court found a *Brady* violation even though the jury had already heard some impeachment evidence. There, the undisclosed promise not to prosecute a cooperating witness's son was held to be material because it added a new layer to the witness's incentive structure, something the jury never got to weigh. *LaCaze*, 645 F.3d at 736–39.

This principle was also reaffirmed by the Supreme Court in *Wearry v. Cain*, 577 U.S. 385 (2016), where the State's case hinged on a jailhouse informant. That informant "had twice sought a deal to reduce his existing sentence in exchange for testifying against [the defendant]. The police told [the informant] that they would 'talk to the D.A. if he told the truth.'" *Id.* at 387. That hope for a reduced sentence was neither disclosed to the defendant nor the jury.

The Court rejected the notion that other evidence could save the verdict: "the only evidence directly tying Wearry to the crime was [the informant's] dubious testimony, corroborated by the similarly suspect testimony of two other inmates." *Id.* at 388. The prosecution's case was, as the Court put it, "a house of cards." *Id.* The Court reversed the conviction, holding that "even if the jury—armed with all

the relevant evidence—could have voted to convict, we have no confidence that it would have done so." *Id.* at 392.

### II.B.2. Brown's testimony was material under *Brady's* standard

The facts relevant to this analysis are set forth in detail in Section II.A.2, *supra*, and are incorporated here.[8] Here, Brown was the only witness who placed Mata at the scene of the crime. Mata's co-defendant Castillo never once identified Mata. In fact, he affirmatively disclaimed knowing her repeatedly to police and at Mata's trial. ROA.1458–59, 1482, 1488. Even though he never implicated Desirae Mata, details about Castillo's confession came in through hearsay testimony. No other witness connected Mata to the murders. The supposed DNA evidence was a simple "cannot be excluded," which is not particularly damning, but even if it was an outright inclusion, it would be no more than background noise: it merely established that Mata had once lived in the house, and the State's own DNA expert testified as much. ROA.1400, 1112, 1407. The jail calls with Rollie and Mata discussing a diamond deal Rollie had made with Allen likewise show Mata's frustrations with Rollie; they do

---

[8] The factual and legal issues raised in this brief necessarily overlap. While every effort has been made to avoid unnecessary repetition, some duplication is inevitable given the interrelated nature of the *Brady* and *Napue* materiality claims and the complexity of the Section 2254(d) analysis. Appellant respectfully asks the Court's indulgence as she works to clearly present both the facts and the law that are relevant to each ground raised in this brief with as little needless repetition as possible.

not put her on the scene at the time of the murders. The only evidence that does that is Angie Brown.

Thus, Brown's credibility was fundamental to the State's case. The prosecution knew that. That is why, after trial, the federal government, at the state prosecutor's request, stepped in to reward Brown for her "past and prospective assistance to the District Attorney's office in Gaines County, Texas" *via* the Rule 35 motion to reduce Brown's sentence. ROA.2268–69. The federal court granted that motion. ROA.2267. And under Rule 35(b), such a reduction is only available when the witness has provided "substantial assistance in investigating or prosecuting another person." That "[]other person" was Desirae Mata. Everyone involved—the federal prosecutor, the federal court, and the state prosecutor— recognized that Brown's cooperation helped convict Mata.

As the district court pointed out, there was some, minimal, impeachment evidence against Brown, discussed at length in Section II.A.2 above. But *LaCaze* makes clear that a *Brady* claim does not rise or fall based on whether *some* impeachment was already introduced. 645 F.3d 728, 736 (5th Cir. 2011). "Relief should not be denied just because the jury had other factors to consider when assessing [the witness's] credibility." *Id*. Materiality turns on whether the *withheld* evidence—here, Brown's multiple desperate pleas asking for the reduction for the

sake of her young children—could have put the whole case in a different light. See *Kyles*, 514 U.S. at 435.

Like in *Holberg*, where the State suppressed key impeachment evidence about a jailhouse informant, the nondisclosure here left the jury with a false impression. Brown testified she had no expectation of leniency. That was a lie. Cloaked with the authority of an officer of the court, Brown's attorney, Rita Briles, endorsed that lie. ROA.1204. Had defense counsel and the jury known the truth, it could have dismantled her narrative and revealed her true motive: helping herself so she could get back home to her children. See *Holberg*, 130 F.4th at 504–05.

Like in *Tassin* and *LaCaze*, in closing arguments, Munk solidified that lie. ROA.1884-85; *see LaCaze*, 645 F.3d at 737 n. 1 (quoting *Tassin*, 517 F.3d at 779) ("Moreover, as in *Tassin,* the State here 'capitalized on this misrepresentation in [its] closing argument' by repeatedly arguing that Robinson had not received a deal that would give him a reason to lie). And of course, before trial even began, when Mata's defense attorney asked the prosecutor whether Brown was hoping for a deal, the prosecutor told the defense attorney no. ROA.2490. That, again, was a lie.

When evaluating the record as a whole, it becomes clear that the State's case against Mata was a "house of cards" akin to *Wearry*, 577 U.S. at 387. Mata had lived with John Allen, so the DNA evidence was not particularly elucidative. She was

upset with Rollie about how *he* handled a business deal with Allen, but that still did not put her as participating in Allen and Doyle's murder. Castillo, deep in heroin withdrawals, gave an incredibly problematic confession riddled with impossibilities that he refused to repeat. So, evidence about the murders themselves came in through the *hearsay* testimony of Castillo's confession. Even then, Castillo never once implicated Desirae Mata, and in fact disavowed knowing her at all; the trial court specifically prohibited either one of the hearsay witnesses to say that Castillo implicated Desirae Mata. Given the evidence to this point, the State's case is weak. Without any physical evidence, the State needed someone or something to tie Desirae Mata to crime scene and to Castillo. *That* is what Angie Brown did.

Even when it denied Mata's petition for discretionary review, four judges on *the TCCA* noted that the conviction was based on the jailhouse informant's testimony, which by statute must be corroborated by independent evidence. *Mata v. State*, 542 S.W.3d 582 (Tex. Crim. App. 2018) (citing Tex. Code Crim. Proc. Ann. art. 38.075). The intermediate appellate court had used the hearsay testimony of Castillo's confession as the "independent evidence" corroborating Brown's testimony. The problem is that Castillo's hearsay, as an accomplice is *also* subject to the same corroboration requirements. *Id.* (citing Tex. Code. Crim. Proc. Ann. art. 38.14). The judges on the TCCA questioned using one form of by-statute inherently

unreliable testimony as corroboration for another form of by-statute inherently unreliable testimony: "If the statutes exist to ensure that a person is not convicted on only unreliable testimony, why would it be okay to allow that so long as two unreliable witnesses testify instead of only one?" *Mata v. State*, 542 S.W.3d 582, 583 (Tex. Crim. App. 2018).

The answer is—it isn't. Two insupportable underpinnings do not make for a stronger foundation. They make for collapse. And when Brown's deal is brought to light, the State's already fragile case buckles entirely. Just like in *Wearry*, once the linchpin testimony is exposed as bought and bargained for, the whole house of cards falls.

There is, at minimum, a reasonable probability that this information would have led at least one juror to question Brown's credibility, and that is all *Brady* requires. The state court's conclusion to the contrary was an unreasonable application of clearly established law. *See* 28 U.S.C. § 2254(d)(1); *Harrington*, 562 U.S. at 101; *Holberg*, 130 F.4th at 502.

Moreover, the district court decision is "contrary to clearly established federal law" as it "confronts [the] materially indistinguishable facts" of *LaCaze* "and arrives at a different result." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir. 2004). In *Lacaze*, the undisclosed promise

not to prosecute a cooperating witness's son was held to be material because it added a new layer to the witness's incentive structure, something the jury never got to weigh. *LaCaze*, 645 F.3d at 736–39. The undisclosed promise to reduce Brown's federal sentence by a third is material because it adds a new layer to Brown's incentive structure, something the jury never got to weigh. To hold suppressing the letters concerning Brown's significant sentence reduction was immaterial contravenes the holding in *LaCaze*, which holds that suppressing impeachment evidence of promises of leniency is material. *Id.* Again, the TCCA's conclusion cannot survive even the Section 2254 standards.

## III.    Conclusion

*Brady* and *Napue* lock arms for one reason: to keep the government honest when liberty is on the line. They exist to protect the jury's sacred role as the arbiter of truth, because when the State hides favorable evidence or props up falsehoods, it tips the scales and breaks the system. *Holberg*, 130 F.4th at 508 ("*Brady* and *Napue* hold hands in their efforts to protect the jury in their decision-making and to preserve the fundamentals of a fair trial."). That is exactly what happened here. Desirae Mata's trial was not a search for the truth—it was a performance rigged for a guilty verdict. Everyone—even Brown's attorney—was in on it; everyone but Mata and her jurors.

For more than a decade, Mata has lived the fallout of that lie: a conviction built entirely on the testimony of a jailhouse informant whose credibility was hollow, whose motive was hidden, and whose reward came not from justice but from a sixty-month sentence reduction delivered by a different courtroom in a different state. The jury never saw those letters. They never heard the truth. And without that truth, they never had a fair chance to weigh Brown's credibility, the only link tying Mata to the crimes she will give the rest of her life for, unless this Court grants her relief.

The courts below and the State repeatedly discuss how the evidence is sufficient to support Mata's conviction even without Brown's testimony. But the answer depends on the question. And the question has never been about sufficiency. At the intermediate appellate court it was about whether a missing jury instruction caused "egregious harm," which is an incredibly high standard to meet—far higher than that required by *Napue* or *Brady*. Respondent and the court below have taken the appellate court's analysis and applied it to observe that the evidence supporting the verdict is sufficient to do so. That is why they will talk about the evidence that *was* there but never reference the evidence that *was not* there without Brown. That is why not once in its opinion, the Court below references the "beyond a reasonable doubt" burden of *Glossip*. They are engaging in the incorrect analysis—one that has an incorrect, and a much higher burden.

The focus instead must be on how things would have changed had the jury known the truth. Had the jury known that Brown was lying about her motives, that her attorney was covering for her, and that the prosecutor also knew it and perpetuated the lie, they might have judged Brown's credibility differently. There is, at minimum, "any reasonable likelihood" that the false testimony affected the verdict. It is certainly not beyond a reasonable doubt that the false testimony did not affect the verdict. That is all *Napue* requires. And *Brady* demands little more. Had the State disclosed the letters revealing Brown's hope for leniency, the jury could have seen her testimony for what it was: a calculated bid for freedom, not a disinterested account of the truth. There is a reasonable probability that at least one juror would have reached a different conclusion, which must undermine this Court's confidence in the outcome of Mata's trial. That is all *Brady* requires.

The TCCA's decision was contrary to clearly established federal law. *See* 28 U.S.C. § 2254(d)(2). The Constitution demands relief, and this Court has both the authority and the responsibility to make it right.

## **PRAYER**

WHEREFORE, for the reasons stated above, Mata prays this Court reverse the state court's denial of Mata's petition for habeas corpus relief under 28 U.S.C.

§ 2254, remand for an evidentiary hearing, or order any further briefing or argument

it deems necessary.

Respectfully submitted,

 /s/ Allison Clayton
Allison Clayton
Texas State Bar No. 24059587

Innocence Project of Texas
Texas Tech School of Law Innocence Clinic
3311 18th Street
Lubbock, Texas 79409-0004
P: (806) 773-6889
F: (806) 688-4515

Allison@IPofTexas.com

ATTORNEY FOR APPELLANT/PETITIONER

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 30, 2025, this document was filed electronically using the

Court's CM/ECF system. All counsel of record who have appeared in this case are

registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Allison Clayton*
Allison Clayton

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to 5th Cir. R. 32.3, the undersigned certifies this Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).

1.  Exclusive of the exempted portions, this brief contains 11,314 words.

2.  This brief has been prepared in proportionately spaced typeface using Microsoft Word in Equity typeface and Concourse typeface in 14 point font size.

3.  The undersigned understands that any material misrepresentations in this certificate may result in striking the brief and sanctions.

*/s/ Allison Clayton*
Allison Clayton
